**CASCO BAY LINES**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Aug. 8, 1978.

Verrill & Dana by Roger A. Putnam, Portland (orally), for plaintiff.

Thomas R. Gibbon (orally), Public Utilities Commission, Horace S. Libby, Augusta, Murray, Plumb & Murray by Peter L. Murray, Portland, for Casco Bay Island Development Association.

Sunenblick, Fontaine & Reben by Howard T. Reben, Portland, for Island Citizens Association.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

PER CURIAM.

On April 28, 1975, Casco Bay Lines ("*Casco*") filed with the Public Utilities Commission ("*Commission*") a petition alleging unreasonable, unjust, inadequate, and unjustly discriminatory rates; a petition to implement increased cruise and charter rates on less than statutory notice; and, a request for a general increase of 12.68% in passenger and freight rate tariffs, accompanied by a petition for an emergency interim rate increase. After a summary investigation, the Commission suspended the proposed rates and charges for a period of three months from May 30, 1975, unless otherwise ordered. On May 27, 1975, the Commission found that Casco had met the standards for interim rate relief and permitted certain rate increases to become effective as of May 30, 1975, subject to refund upon its final determination.

On August 29, 1975, the Commission issued its consolidated Decree, *Re Casco Bay Lines,* 11 P.U.R. 4th 172 (Me.Pub.Util. Comm'n.1975), disallowing Casco's proposed rate changes, with the exception of the interim rates of May 30, 1975, which were allowed to become permanent. The Commission further authorized Casco to file new rate schedules to produce an annual revenue increase of $21,680.75 or 4.59% over the expected 1975 revenues. Casco filed with the Commission new rates to produce the permitted revenue increase, which were

approved by the Commission to become effective September 28, 1975.

On September 18, 1975, Casco filed a Petition for Reconsideration, Rehearing and Reopening of the Commission's August 28, 1975 Decree. The petition was denied by the Commission on October 7, 1975.

Casco then initiated the instant proceedings for judicial review on November 5, 1975, by invoking this Court's "appeal" jurisdiction under 35 M.R.S.A. § 303 ("Section 303 appeal") and its additional "complaint" jurisdiction under 35 M.R.S.A. § 305 ("Section 305 complaint").

Subsequently, on January 26, 1976, Casco filed with the Commission new petitions seeking increases in passenger and freight tariffs. On May 24, 1976, the Commission approved a new schedule of rates, resulting from a negotiated settlement among the staff, Casco, and certain intervenors. The effect of the decree was to produce a rate increase averaging 18½% over the rates which are the subject of the case before us, effective May 28, 1976.

We dismiss Casco's Section 303 appeal for mootness. We deny Casco's Section 305 complaint upon the merits and order judgment thereon in favor of the defendant Commission.

## I. Mootness Issues

The Commission moves this Court to dismiss Casco's Section 303 appeal as moot upon the basis of our decision in New England Telephone & Telegraph Co. v. Public Utilities Commission, Me., 354 A.2d 753 (1976), which was decided after the immediate appeal was taken. In its reply brief

Casco concedes that its Section 303 appeal is moot under this recent decision and urges this Court to dismiss the appeal. We grant the dismissal of the Section 303 appeal.

The Commission also moves this Court to dismiss Casco's Section 305 complaint because it fails to state a claim upon which this Court has power to grant relief and because it is moot. On the other hand, Casco argues against the dismissal of its Section 305 complaint on the grounds that this Court has the power to grant the relief requested, thereby rendering the complaint not moot. As in New England Telephone & Telegraph Co. v. Public Utilities Commission, supra, we find it unnecessary to decide in the instant case whether Section 305 confers upon this Court an independent power, legislatively withheld from the Commission, to afford after-the-fact remedial relief as to Court's loss of revenues from the date of the Commission's order for an allegedly inadequate 4.59% rate increase (August 29, 1975) to the date the subsequent legal rates became effective (May 28, 1976).[1]

## II. The "Merits" Issues

### A. Average Test Year Expenses Analysis

Casco contends that the Commission's use of an average test year analysis to determine the Company's expenses for ratemaking purposes constituted an error of law, denied it procedural due process, and confiscated its property. In effect, the Commission determined Casco's expenses for certain items, such as advertising and repairs, by calculating a four-year average of the annual expenses for those items from

---

1. This case is distinguishable from our recent decision in Portland Water District v. Public Utilities Commission, Me., 388 A.2d 91 (1978), in which we held that both the utility's Section 303 appeal and Section 305 complaint were mooted by a subsequent unappealed Commission decision granting an increase in permanent rates. In that case we emphasized that the subsequent Commission Decree specifically addressed the matters raised in the prior case and was designed to remedy the utility's losses during the past. Accordingly, the subsequent Decree superseded the prior Decree and rendered it moot.

Such is not the case here. The settlement agreement embodied in the Decree of May 24, 1976, specifically provided:

The settlement would have no precedental value. The settlement would not seek to be a resolution of the issues which the various parties . . . have raised or would have raised had full and complete hearings been held on Casco Bay Lines' petitions. Rather, it seeks to satisfy the immediate revenue deficiencies of Casco Bay Lines.

1971 to 1974. In so doing, the Commission appears to have substantially adopted the expense figures presented by Casco in its Request for Findings of Fact by the Commission. Casco now argues before this Court that the averaging analysis denied it due process of law and confiscated its property because *"in this inflationary society the average of the last three or four years' expenses does not reflect even current expenses let alone expenses which will be incurred in the period of time in which the rates are generally expected to be in effect."* Thus, Casco urges this Court to rule, as a matter of law, that in an inflationary period it would be an error of law to project operating expenses into the future by averaging the costs of operating over the last four-year period.

We find it is unnecessary to reach this question.

As the Commission correctly stresses in its brief, the expense figures derived from the four-year averaging analysis, are substantially those proposed by Casco in the proceedings before the Commission below. Apparently, Casco followed, without question,[2] the averaging analysis used by the Commission in past Casco rate proceedings to calculate its proposed expenses for the 1975 rate case. These averaged expenses were incorporated in Casco's Request for Findings of Fact. The Commission substantially adopted all the expense figures proposed by Casco. The only differences in its final decree appear to be an increase in Casco's travel and convention expense (in Casco's favor) and the disallowance of auto and bus commuting expense (considered below, II–F). The Commission is now faced for the first time with any serious objection by Casco to its averaging method.

In *Walsh v. City of Brewer*, Me., 315 A.2d 200 (1974), we stated the principle that disposes of the immediate issue:

It is an acknowledged principle, and one generally followed by this Court as necessary to a sound appellate practice, that an issue raised for the first time at the appellate stage will be denied cognizance in the appellate review of the case. *Reville v. Reville*, Me., 289 A.2d 695 (1972); *Younie v. State*, Me., 281 A.2d 446 (1971); *Frost v. Lucey*, Me., 231 A.2d 441 (1967). *Id.* at 209.

The fact that the proceeding below occurred before the Public Utilities Commission, and not before a trial court, does not affect the application of this principle.

A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action. *Unemployment Compensation Commission of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946).

*See also* 3 K. Davis, *Administrative Law Treatise* § 20.06 (1958).

Similarly, the Commission must be afforded the opportunity to consider a utility's objections to its methodology, and to exercise its expertise and judgment in response to articulated objections and recommendations by the utility. We will not overrule the Commission on an issue which was not adequately presented for its consideration during the proceedings below.

This is not only a case in which the complainant failed to raise the issue below. The complainant suggested the approach ultimately followed by the Commission. The complainant cannot now claim error.

[A] party cannot except to any proceedings of a court, which take place in accordance with his own request, or by his consent. *Mudget v. Kent*, 18 Me. 349, 350 (1841).

*See also Warren v. Waterville Urban Renewal Authority*, Me., 235 A.2d 295, 299 (1967), *cert. denied*, 390 U.S. 1006, 88 S.Ct. 1249, 20 L.Ed.2d 105 (1968); *Portland Flying Service, Inc. v. Smith*, Me., 227 A.2d 446, 447–48 (1967).

2. Although Casco's expert witness Mr. Joseph Stillman stated that he was not in accord with the averaging method, Casco failed to make any serious objection to the method during the proceedings below or in its Petition for Reconsideration, Rehearing and Reopening.

We find no error in the Commission's average test year expenses analysis.

## B. Base Year for Determining Income Growth

■ In order to calculate Casco's 1975 income for ratemaking purposes, the Commission was required to examine Casco's past income history and to make a projection for 1975. In a 1974 Casco rate case, the Commission had examined Casco's income for the years 1970, 1971, 1972, and 1973 to project Casco's income for 1974. Both the Commission Staff and Casco claimed to follow the 1974 rate case method in calculating the income growth projections, which they presented during the proceedings before the Commission below. However, they differed as to their interpretations of the 1974 method, and, consequently, in the results reached.

The Commission Staff claimed to follow the 1974 case by using 1970 as a base year and examining Casco's income for the years 1970, 1971, 1972, 1973, and 1974. Accordingly, the Staff calculated 1975 income due to growth to be $11,917.46. On the other hand, Casco claimed to follow the 1974 case by using the *"fourth previous year"* (1971) as a base year and examining Casco's income for 1971, 1972, 1973, and 1974. Casco's use of more recent years produced a lower calculation of 1975 income due to growth of $6,238.28, because of recent inflationary trends.

Faced with these conflicting interpretations and results, the Commission found as follows:

*While both are correct, it is apparent if the commission were going to be consistent, it would use 1970 as a base year since the base year is the crucial factor in determining growth. Nevertheless, no testimony was presented in this case by the company or by the staff as to which year would be the more appropriate base year. In the absence of such testimony and in recognition that growth income may never be predicted exactly, we find that a reasonable prediction for growth [sic] income is $9,077.87, which is the av-erage of CBL's and the staff's prediction. Re Casco Bay Lines, supra at 175.*

We sustain the Commission on this issue.

The Commission's *"Solomonic"* solution which involved *"splitting the difference"* is dependent upon two considerations: first, whether its finding, that no testimony was presented in this case as to which year would be the more appropriate base year, was supported by *"substantial evidence"*; and, second, whether the final resolution reached by the Commission was *"reasonable"*. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8 (1978).

Our search of the record fails to disclose any significant testimony as to which year, 1970 or 1971, would be the more appropriate base year. Both the Commission Staff and Casco claimed to be following the method used by the Commission in Casco's 1974 rate case, but neither attempted to affirmatively demonstrate why its base year was more appropriate. The isolated statement of Casco's witness, that 1972 might be a more appropriate base year than either 1970 or 1971, does not constitute the testimony required to place the base year issue before the Commission. As we stated with respect to the expense averaging issue, a utility cannot raise an issue upon appeal when it has not afforded the Commission adequate opportunity to consider the matter during the proceedings below.

We are now confronted with the question of the reasonableness of the Commission's approach in this case. The calculation of the projected growth in income for a future period is a process of estimation and, as the Commission stated, *"may never be predicted exactly"*, Re Casco Bay Lines, supra at 175. In fact, both Casco's and the Staff's approaches involved the averaging of income over a number of years. Under such circumstances, we cannot find unreasonable the Commission's averaging of their resulting figures, both of which presumably were based upon reasonable methods.

■ We caution the Commission that our decision in the case does not constitute ap-

proval of a practice of *"splitting the difference"* in general. The Commission has the duty to exercise its expertise and judgment in ratemaking proceedings. It may not abdicate that responsibility by splitting the difference whenever its Staff and a utility disagree. When a legitimate issue is appropriately raised before the Commission it must discharge its responsibility and resolve that issue.

### C. Gain from Sale of Depreciated Property

In 1974, Casco sold certain depreciable property (three vessels) and realized a net gain of $28,396.47. This was treated as extraordinary income and applied against a $50,000 operating loss sustained in 1974. The Commission found that the ratepayers were entitled to benefit from the sale of the assets and allocated the gain over a three-year period so as to reduce Casco's depreciation expense for ratemaking purposes during those three years. In order to provide Casco's investors with an incentive to sell depreciable property for the best price, the Commission allowed Casco to retain 10% of the gain.

Casco claims that the Commission's flow-through of 90% of the gain on the sale of the depreciable property deprived it of its property without reasonable compensation and without due process.

We sustain the Commission on this issue.

Depreciation expense is one of the operating costs utilities are allowed to recover from their ratepayers through their rates and charges. The purpose of such depreciation is to return to the utility its original cost for the property over its useful life. Upon retirement of the property, the total accrued depreciation plus its remaining value upon retirement (if any) is expected to equal its original cost. Thus, the utility recovers its original investment through its annual depreciation expense plus its proceeds upon disposition of the property. If the proceeds from the sale of a depreciated asset plus the accrued depreciation are greater than the original cost, the utility had realized a gain upon the sale of the asset. It is the disposition of such a gain upon the sale of depreciation property which is at issue here.

The Commission's Decree treated the gains as follows:

> We reaffirm our position that the ratepayers should benefit from the sale of depreciable assets. The purpose of depreciation is to recover the original cost of the property over its useful life. This recovery is effected through depreciation charges or through salvage. If there is a gain from the sale of depreciable property, it indicates that depreciation has been miscalculated and that the ratepayers have been overcharged. Furthermore, we note that utilities are permitted to amortize losses from the retirements of utility property in certain circumstances. See, for example, PUC Uniform System of Accounts for Electric Utilities at p. 23, item 23(D).
>
> Accordingly, we shall use the gains from depreciable property to reduce depreciation expense for rate-making purposes. Since it is the past ratepayers who provided the excess depreciation expense, they are the ones who should primarily receive the benefits from sale of depreciable assets. Therefore, we shall spread the net gain over a period of three years. The commission is aware that if the stockholders receive no benefit from the sale of depreciable property, there may be no incentive to achieve the best possible purchase price. In order to avoid this problem, we will allow the company to retain 10 per cent of the gain. *Re Casco Bay Lines, supra* at 174–75.

█ It is entirely reasonable to redistribute those excessive depreciation payments back to the ratepayers by means of future reductions in Casco's depreciation expense. *See Democratic Central Committee of District of Columbia v. Washington Metropolitan Area Transit Commission,* 158 U.S.App. D.C. 7, 485 F.2d 786 (1973), *cert. denied* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *In re Revision of Rates Filed by Plainfield-Union Water Co.,* 57 N.J.Super. 158, 154 A.2d 201 (1959); *Re D. C. Transit*

*System, Inc.,* 85 P.U.R.3d 508 (Wash.Met. Area Trans. Comm'n 1970); *Re The Detroit Edison Co.,* 20 P.U.R. 4th 1 (Mich.Pub.Serv. Comm'n 1977); *Re Minneapolis Street Railway Co.,* 31 P.U.R.3d 141 (Minn. R.R. & Warehouse Comm'n 1959); *Re Salt Lake City Lines,* 30 P.U.R.3d 319 (Utah Pub.Serv. Comm'n 1959); *Re Wyoming Gas Co.,* 40 P.U.R.3d 509 (Wyo.Pub.Serv.Comm'n 1961).

■ Furthermore, we note that when a utility sells property at a *loss* it is generally allowed to amortize such loss as an expense to be recovered from its ratepayers. *Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission, supra* 158 U.S.App. D.C. at 29–32, 485 F.2d at 808–11; *Re Casco Bay Lines, supra* at 175. It is only equitable that the ratepayers who bear the cost of depreciation and maintenance on the property and the burden of a sale at a loss, should be entitled to benefit from the sale of such property at a gain. *Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission, supra* 158 U.S.App. D.C. at 42–43, 485 F.2d at 821–22.

■ In the alternative Casco argues that if its investors are to be denied the gain on the sale of its assets, such gains should, at least, be applied against its 1974 operating loss or offset against those years in the past when it failed to attain the rate of return allowed by the Commission. Ratemaking techniques lie primarily within the discretion and expertise of the Commission and may not be disturbed by this Court if they are reasonable and supported by substantial evidence. *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* (1978). We find that the Commission's decision to allocate the gain to the ratepayers by reducing Casco's depreciation expense over a period of three years is a reasonable method to account for the excessive depreciation paid by such ratepayers in the past. The record contains substantial evidence to support the Commission's actions.

We sustain the Commission with respect to its treatment of gain from the sale of depreciable assets.

**D. Interest Income and Interest Expense**

During 1974 Casco received $6,061 in interest on investments and other debts which it was owed by others (interest income). During the same year Casco paid $6,960 in interest on debts it owed others (interest expense). Casco proposed to offset the interest expense against the interest income so as to produce a net interest income of negative $899. However, the Commission refused to offset interest income and interest expense for ratemaking purposes. It found that the ratepayers were entitled to the interest income which Casco received on the funds they had supplied. Accordingly, it allocated 75% of the interest income to Casco's operating revenues, thereby reducing its revenue requirements. Casco was allowed to retain the remaining 25% as a reward and incentive for good investments. On the other hand, the Commission excluded interest expense from Casco's operating expense for ratemaking purposes.

Casco argues that the Commission's refusal to offset interest expense against interest income for ratemaking purposes is confiscatory and inequitable.

We sustain the Commission on this issue.

Before proceeding to the Commission's treatment of interest income and interest expense, a brief discussion of the ratemaking technique used in this case is in order. Unlike cases in which the return to the utility is determined by applying a percentage rate of return to its ratebase,[3] the return to Casco and other transit utilities is determined by means of an *"operating ratio"*.

*An "operating ratio" is a ratio of operating expenses to operating revenues. If expenses equal revenues, the ratio is 100. As expenses exceed revenues the number increases to over 100, and in cases in*

---

**3.** *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* (1978); *Me-* *chanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977).

which revenues exceed expenses, the number is less than 100. *Maine Motor Rate Bureau,* Me., 357 A.2d 518, 521, n. 2 (1976).[4]

The Commission has established a 93% operating ratio for Casco, which Casco does not challenge in this case. Accordingly, 93% of Casco's operating revenues cover its operating expenses, with the remaining 7% going to its investors. The Commission's inclusion of interest income in Casco's operating revenues decreases its net return. Similarly, its refusal to include interest expense in operating income produces a lower return to Casco. We will consider the Commission's treatment of each of these items separately.

■ (1) Casco's interest income is derived from various sources including bank certificates of deposit, a U.S. Treasury Note, interest paid by the I.R.S. on tax refunds, and interest on debts owed by other businesses. The Commission's Decree treats the interest income as follows:

*We think it is entirely reasonable that the ratepayers should share in the benefit from the investment of money supplied by them. One of the reasons that CBL is able to earn the interest income is that CBL receives the bulk of its revenues during summer months and spreads its expenses over the entire year. Since it is the ratepayers who supply the cash for these interest-bearing investments, they should share the benefits. On the other hand, part of the money supplied by the ratepayers flows to the owners as profits. Also, it is the owner's business sense and profit incentive which is partially responsible for this income. Therefore, we find it reasonable for the purposes of this case that interest income should be divided 25 per cent to the owners and 75 per cent to the ratepayers.*

*In accordance with the above discussion, we shall add $4,148 to the company's*

income projections which takes into account that $530.66 of the $6,061.49 which is income from non-recurring loans. *Re Casco Bay Lines, supra* at 178.

The Commission properly decided that, as a matter of ratemaking policy, the rate-makers are entitled to share in the interest collected by Casco on funds provided through their fares and charges. We also find no error in the Commission's refusal to include $156.70 interest paid by the I.R.S. on a tax refund as income from a nonrecurring loan, because Casco waived that issue in its reply brief before the Commission.

We sustain the Commission's inclusion of $4,148 of interest income in Casco's operating revenues for ratemaking purposes.

■ (2) The Commission excluded interest expense from operating expenses for the following reason:

*In Re Casco Bay Lines (1962) F.C. No. 1669, this commission found that the operating ratio of 93 per cent* "will produce sufficient revenue to cover operating expenses *and make ample provision for interest payments,* federal income taxes and provide reasonable earnings to the petitioner." *[Emphasis ours.] Thus, it is apparent that the 93 per cent operating ratio makes allowance for the interest expense of CBL and that there is no need for interest expense to be paid from interest income. Re Casco Bay Lines, supra at 178.*

Essentially the question is whether interest expense should be included in Casco's operating ratio (ratio of operating expenses to operating revenue) as an operating expense or as an offset to the interest income portion of operating revenues. The Commission found that interest expense was not to be considered as a part of Casco's operating ratio. Rather, Casco's interest expense must be satisfied from the 7% of operating

---

4. *See generally,* E. Nichols, *Ruling Principles of Utility Regulation—Rate of Return* 438–42 (1955), 338–40 (Supp. A 1964); 1 A. Priest, *Principles of Public Utility Regulation* 221–24 (1969). These authorities explain that operating ratios are used to set rates for transit utili-

ties where operating revenues and expenses are a more significant factor than owner investment. On the other hand, a percentage rate of return is preferred for capital intensive utilities such as electric and telephone companies.

revenues remaining after operating expenses are met. In this we find no error.

It appears to be a basic principle of ratemaking that interest expense is neither a proper charge to operating expense nor a proper deduction from revenues, but must be satisfied from the return to investors. *City of Covington v. Public Service Commission,* 313 S.W.2d 391, 393–94 (Ky.1958); *Oklahoma Natural Gas Co. v. Corporation Commission of Oklahoma,* 90 Okl. 84, 216 P. 917, 922 (1923); *Re Crystal Water Co.,* 31 P.U.R.3d 214, 217–18 (Conn.Pub.Util. Comm'n 1959); *Ex Parte Breaux Bridge Telephone Co.,* 26 P.U.R.3d 184, 185–86 (La. Pub.Serv. Comm'n 1958); *Re West Jersey Water Service, Inc.,* 78 P.U.R.3d 61, 63 (N.J.Bd. of Pub.Util. Comm'rs 1969); *Re Northern Gas Co.,* 70 P.U.R.3d 260, 268–69 (Wyo.Pub.Serv. Comm'n 1967); 64 *Am. Jur.2d "Public Utilities"* § 185 (1972); and cases located at *P.U.R. Digest "Expenses"* §§ 54, 57. The Maine Public Utilities Commission has applied this principle in the past. *Re New England Telephone & Telegraph Co.,* 23 P.U.R.3d 510, 519 (Me.Pub. Util. Comm'n 1958); *Re Milo Water Co.,* 1930 B P.U.R. 269, 275 (Me.Pub.Util. Comm'n 1930); *Re Lincoln Water Co.,* 1919 B P.U.R. 752, 757 (Me.Pub.Util. Comm'n 1919).

Interest was treated as a factor in determining rate of return in *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra,* and *Mechanic Falls Water Co. v. Public Utilities Commission, supra.* The same rule applies when return is determined by means of an operating ratio.

> The operating ratio method permits a carrier to earn an amount representing annual operating costs, <u>plus an additional amount from which to pay interest to the creditors</u> and dividends to the owners. *D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission,* 121 U.S.App.D.C. 375, 382, 350 F.2d 753, 760 (1965) *cert. denied,* 389 U.S. 847, 88 S.Ct. 52, 19 L.Ed.2d 115 (1967), 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969) (emphasis supplied).

As the Commission points out, allowing Casco to recover interest expense as a cost of operation would constitute double payment by the ratepayers who already provide for its interest expense through Casco's operating ratio.

We find no error in the Commission's exclusion of interest expense from the operating expenses or operating revenues portion of Casco's operating ratio and sustain its actions with respect thereto.

### E. Pension and Life Insurance Expenses

The president and vice president of Casco each own 50% of the company's stock. Casco sought a $13,376.76 pension expense for its employees, including $6,750 for these two officers. The pension plan is funded entirely by Casco, which contributes a sum equal to 15% of the qualifying employee's salary. In addition, Casco sought a $1,581.11 life insurance expense, including $601.20 for the same two officers. The life insurance plan is also entirely funded by Casco, but the insured may designate the beneficiaries. Casco's two owner/officers, as directors of the Company, voted for the pension and life insurance plans which appear entirely elective for Casco.

The Commission disallowed as expenses for ratemaking purposes, the pension and life insurance expense associated with Casco's president and vice president, stating:

> We are of the opinion that when considered with all the other benefits received by the two owner/officers, these expenses are unreasonable. Both officers receive substantial salaries and have extensive expense accounts. The company failed to sustain its burden of showing the value received by CBL for these pension and life insurance expenses. As a result, this pension expense and life insurance expense appear not to be a reasonable business expense, but a disguised dividend. Accordingly, we disallow the owner/officer pension and life insurance expense for rate-making purposes and are of the opinion that these owner/officer expenses should be borne by the stockholders.

*We note further that the company failed to show how these expenses were necessary to the reasonable operation of CBL's business. It is apparent that the pension and life insurance plans, as presently constituted, are designed to benefit the present owners/officers rather than to attract and maintain other new employees. Re Casco Bay Lines, supra at 176.*

We find no error in the Commission's treatment of this item.

◼ The Commission's decision that the expenses in question were not reasonable expenses for ratemaking purposes is based primarily upon Casco's failure to meet its burden of showing their reasonableness. A public utility bears the burden of proof before the Public Utilities Commission to establish the justness and reasonableness of its proposed rates. 35 M.R.S.A. § 307; *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 299, 163 A.2d 762, 765 (1960); *In re Central Maine Power Co.* 152 Me. 32, 36, 122 A.2d 541, 543 (1956); *Central Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 266–67, 109 A.2d 512, 516 (1954). We emphasized the rule that the burden of proof is upon the utility in our recent decision in *Maine Water Co. v. Public Utilities Commission,* Me., 388 A.2d 493 (1978):

*The staff, of course, is not required to introduce any direct evidence in a rate case proceeding for the burden of proof is upon the utility to demonstrate that its proposed rate increase is just and reasonable. 35 M.R.S.A. § 307. If the staff chooses not to present a case-in-chief, the Commission is not bound to accept the uncontradicted testimony of the utility but is free to weigh the evidence, determine the credibility of the utility's experts, and draw its own independent conclusions. Id. at 496.*

◼ During the proceedings before the Commission below, not only did the Staff choose not to present any direct evidence concerning the reasonableness of the pension and life insurance expenses, but also Casco presented no significant evidence to support these expenses. Casco's expert witness did present substantial testimony concerning the nature of the pension and life insurance plans. However, the only justification given for these expenses was that the life insurance plan provides employees with a fringe benefit *"to solidify their employment."* Under the circumstances, the Commission could properly find that Casco failed to meet its burden of proving the reasonableness of these fringe benefits for its owner-officers.

◼ Our decision in this case does not constitute approval of a regulatory rule that all fringe benefits for a utility's owner-officers are *per se* unreasonable. Such expenses should only be disallowed upon a finding by the Commission, supported by the record, that the utility has failed to meet the burden of proving the reasonableness of such expenses.

◼ This burden of proof is understandably greater when the fringe benefits apply to the owner/officers of a small public utility such as Casco than when they apply to non-owner/officer employees, because of the substantial potential for abuse. We reaffirm our general approval of the allowance of pension costs as an operating expense found in *Central Maine Power Co. v. Public Utilities Commission, supra,* 150 Me. at 273–75, 109 A.2d at 519–20.

We find no error in the Commission's finding that Casco failed to meet its burden of proof with respect to such fringe benefits in this case.

F. Commuting Expense

◼ Casco's proposed expenses for ratemaking purposes included $4,090.29 for auto and bus expenses. The Commission disallowed $1,095 of this amount, which was associated with the commuting expenses of Mr. McLaughlin, Casco's vice president and general manager. Casco asserts that the Commission's action renders its rates confiscatory.

We sustain the Commission on this issue.

494

Mr. McLaughlin lives ten miles from his Casco office and is supplied with a company car because he is on call seven days a week, twenty-four hours a day. He uses the car to travel to work at the Casco office, for which Casco claims $.15 per mile as an expense.

The Commission disallowed $1,095 (20 miles/day × 365 days × $.15/mile) in such commuting expense, stating:

> Commuting expenses of utility employees are not proper expenses to be charged to the ratepayers. That Mr. McLaughlin chooses to live ten miles from work should not affect the rates customers pay for CBL's services. Re Casco Bay Lines, supra at 177.

Casco does not challenge the figures as applied in the Commission's computation (e.g. $.15 per mile or 365 days per year of commuting). Rather, it challenges the Commission's disallowance of such commuting expenses in general. We find no merit in Casco's arguments.

We find no error in the Commission's action on this issue.

### G. Liability Insurance Expense

Casco's rate request included an increase from $1,200 to $3,500 for its annual premium for general liability insurance on its wharves and piers. The evidence indicated the increase was caused by accidents on the wharf which were not related to Casco or its operations. Because the accidents were not connected with Casco's property, Mr. McLaughlin asked the Company's insurance agent to inquire into what appeared to be an unreasonable premium increase. The agent had not responded to Mr. McLaughlin at the time the record before the Commission was closed.

The Commission found that the substantially increased insurance premium was not a legitimate expense for ratemaking purposes. Stating that Casco had failed in its duty to obtain insurance coverage at a low cost, the Commission allowed an insurance expense of only $3,000 for ratemaking purposes. Re Casco Bay Lines, supra at 178.

We hold the Commission's treatment of Casco's liability insurance expense to be an arbitrary exercise of its power. Such error, however, does not warrant further action by this Court because of the relatively small amount of money involved.

Unlike the life insurance, pension and commuting expenses, which were imposed by Casco's own management upon its ratepayers for the benefit of its owner-officers, the liability insurance expense is an actual cost imposed upon Casco by a separate business entity. Such costs, being the result of arm's-length transactions, carry a presumption of reasonableness. There is no evidence that Casco's management acted imprudently or in bad faith with respect to this expense. See Central Maine Power Co. v. Public Utilities Commission, 153 Me. 228 at 242, 136 A.2d 726 at 736. Moreover, the testimony shows that Mr. McLaughlin made a reasonable and prudent inquiry into the premium increase. The Commission's finding that this expense was unreasonable is not supported by the evidence in the record and, therefore, its disallowance of $500 was not warranted.

Although error exists in the Commission's disallowance of $500 of the expense item, we find that the relatively small amount of money involved makes it unnecessary for this Court to consider its remedial powers under Section 305. Ratemaking is not an exact science and often calls for estimations and predictions. The Commission and the utilities might overestimate in one area and underestimate in another. The Commission's final decision must be accorded some margin for error. Accordingly, this Court is primarily concerned with the reasonableness of the overall result. New England Telephone & Telegraph Co. v. Public Utilities Commission, supra (1978).

In this case, the Commission committed error in its disallowance of $500 in liability insurance expense. On the other hand, the Commission granted Casco $1,200 more for professional fees expense than it had requested. These amounts appear relatively insignificant when compared to the total of $459,426 in operating expenses allowed by

the Commission in its operating ratio computation. Recognizing that ratemaking is a process of estimations and predictions, we cannot find that the total effect of the Commission's decision on this issue results in confiscation of Casco's property. The Commission's error does not warrant our consideration of this Court's remedial powers under 305 in this case.

### H. Professional Fees Expense

 Casco requested a total of $29,524.06 for professional fees, including rate case and union negotiation costs. The Commission ultimately allowed a professional fee expense of $30,727. Casco claims that the Commission's selection of amortization periods and related calculations were erroneous and unfounded. Our examination of the record and the briefs of the parties convinces us that the Commission committed no significant error in its treatment of professional fees and that any error that might exist is not of sufficient consequence to require reversal or modification of the Commission's Decree.

### I. Petition for Reconsideration

Casco claims that the Commission's denial of its Petition for Reconsideration Rehearing and Reopening constituted an abuse of discretion, because it was allegedly surprised by the Commission's consideration of four important areas.

We find no abuse of discretion in the Commission's denial of the Petition. *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 329 A.2d 792, 805 (1974); *Augusta Water District v. White*, Me., 216 A.2d 661, 664 (1966). Our examination of the record reveals that Casco was sufficiently apprised that these four areas were in issue and that it was accorded ample opportunity to address them during the hearings and in its briefs before the Commission. In addition, we agree with the Commission that its admitted $67 error in the computation of professional fees expense did not justify a reopening of the case.

The entry must be:

(1) The Commission's motion to dismiss Casco's Section 303 appeal is granted; said appeal is dismissed.

(2) Casco's Section 305 complaint is denied; judgment for the defendant Commission.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.