### CONTINENTAL TELEPHONE COMPANY of Maine

v.

### PUBLIC UTILITIES COMMISSION et al.

Supreme Judicial Court of Maine.

Feb. 20, 1979.

---

1. The record does not show whether Mrs. Hanks was present at the trial.

2. Rule 502, M.R.Evid.

Southard, Hunt & Hebert by Frank E. Southard, Jr., Augusta (orally), Huber, Magill, Lawrence & Farrell by Norman Abell, New York City (orally), for plaintiff.

Alan G. Stone (orally), Horace S. Libby, Frederick S. Samp, Public Utilities Commission, Augusta, for defendants.

Before POMEROY, WERNICK, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

GODREY, Justice.

On April 22, 1976, Continental Telephone Company of Maine ("Continental"), a wholly-owned subsidiary of Continental Telephone Corporation, filed with the Maine Public Utilities Commission a revised schedule of rates designed to produce an increase in annual revenues of about $510,000. Pursuant to 35 M.R.S.A. § 69, the Commission suspended the proposed rate schedule for an initial three-month period and then for an additional five-month period. On January 21, 1977, the Commission issued its decree, *Re Continental Telephone Company of Maine*, 18 P.U.R. 4th 636 (Me.Pub.Util. Comm'n 1977), disallowing the proposed rate increase in its entirety as unjust and unreasonable. Instead, the Commission ordered Continental to file a new schedule of rates designed to produce a decrease in annual revenues of not less than $408,306. Continental filed a "Petition for Reconsideration," which was denied by a supplemental order of the Commission dated February 22, 1977.

On February 18, 1977, Continental seasonably initiated the instant proceedings for judicial review by invoking this Court's "appeal" jurisdiction under 35 M.R.S.A. § 303 [1] and its "complaint" jurisdiction under 35 M.R.S.A. § 305.[2] On March 23, 1977, then

Chief Justice Armand A. Dufresne, Jr. denied Continental's motion for a temporary stay of the Commission's rate reduction order. In a supplemental order dated March 8, 1977, the Commission designated March 26, 1977, as the effective date for the new rate schedule designed to implement the $408,306 rate decrease. Continental filed a second appeal under 35 M.R.S.A. § 303 from this order on April 6, 1977. By procedural orders of the Chief Justice, for the Court, Continental's section 303 appeals were consolidated with its section 305 action as a single proceeding, the issues being limited to those raised in the section 305 complaint.

We deny Continental's section 303 appeals and grant judgment for the Commission on the section 305 complaint.

## I. *Consolidated Income Tax*

Continental filed its federal income tax return on a consolidated basis with its parent, Continental Telephone Corporation, and other subsidiaries in the Continental Telephone system. The parent company charged Continental the standard federal corporate income tax rate of 48 per cent of its taxable income as Continental's "share" of the consolidated system's tax liability. However, the Commission applied its "chronic loss" theory to produce an "effective tax rate" of 31.4 per cent, which it used to determine Continental's federal income tax expense for rate-making purposes. Continental objects to the Commission's use of an effective tax rate to account for its proportionate share of the federal income tax liability of the Continental system on two grounds.

First, Continental attacks the substantive merits of the Commission's use of an effective tax rate. We considered thor-

1. Section 303 provides in pertinent part:
   "An appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action."

2. Section 305 provides in pertinent part:
   "Notwithstanding sections 303 and 304, in all cases in which the justness or reasonable-

ness of a rate, toll or charge by any public utility or the constitutionality of any ruling or order of the commission is in issue, the law court shall have jurisdiction upon a complaint to review, modify, amend or annul any ruling or order of the commission, but only to the extent of the unlawfulness of such ruling or order."

oughly and rejected similar arguments in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1091–95 (1977). There, we held that the Commission could disregard the standard 48 per cent federal corporate income tax rate in determining a utility's federal income tax expense for rate-making purposes, and, instead, employ a lower effective tax rate which reflects its proportionate share of the consolidated system's actual tax liability. *See Mars Hill & Blaine Water Co. v. Public Utilities Commission*, Me., 397 A.2d 570, 575–78 (1979); *Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 494–95 (1978).

■ Continental does raise a contention which was not considered in *Mechanic Falls, supra;* namely, that the 31.4 per cent effective tax rate is arbitrary because it is alleged to be merely a "spot figure" for one year and inherently unstable. The Commission has recognized that the effective tax rate may fluctuate from year to year, and, accordingly, as a proper exercise of its rate-making expertise and judgment, has used an "average" effective tax rate where the evidence supports such use. *See Mars Hill & Blaine Water Co. v. Public Utilities Commission, supra,* 397 A.2d at 575–78. However, in the present case the data in the record before the Commission produced an effective tax rate for only the 1975 test year. Therefore, the Commission was justified in calculating an effective tax rate based upon the experience of a single test year, as it did in *Mechanic Falls Water Co. v. Public Utilities Commission, supra.*

■ Second, Continental's section 305 complaint asserts that the Commission's use of an effective tax rate to determine Continental's proportionate share of the Continental system's consolidated tax liability, plus its use of the Continental system's consolidated capital structure and cost of debt to allocate to Continental a proportionate share of the system's interest expense as an interest deduction for federal income tax expense purposes,[3] constituted imper-

missible "double counting." Double counting allegedly arises from the fact that both these approaches reflect an allocation of the interest on the consolidated system's debt to reduce Continental's federal income tax expense.

This issue is mooted by a stipulation between Continental and the Commission staff dated September 13, 1977, and letter of withdrawal from Continental's counsel dated September 29, 1977. The stipulation provided that Continental's interest deduction for federal income tax purposes would be determined solely on the basis of its own debt ratio and cost of debt. The stipulation disposes of Continental's double-counting argument, and we intimate no opinion at this time on its substantive merits.

We sustain the Commission's use of a 31.4% effective tax rate to calculate Continental's federal income tax expense for rate-making purposes.

## II. *Flow-through of Deferred State Income Taxes to Ratepayers*

■ In computing Continental's state income tax expense for rate-making purposes, the Commission "flowed through" the benefits of accelerated depreciation to the ratepayers. The issue of "flow-through" versus "normalization" of the benefits of accelerated depreciation has been the subject of considerable discussion by this Court in recent months. *See Mars Hill & Blaine Water Co. v. Public Utilities Commission*, Me., 397 A.2d 570, 578–81 (1979); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 15–25 (1978); *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 318–21 (1978); *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1100–03 (1977). Over twenty years ago, in *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 246–49, 136 A.2d 726, 737–39 (1957), we held that the proper treatment of the benefits of accelerated depreciation lay within the rea-

---

**3.** See the discussion of "interest allocation" in *New England Telephone & Telegraph Co. v.* *Public Utilities Commission*, Me., 390 A.2d 8, 25–30 (1978).

soned judgment of the Commission. Our only concern since then has been the effect of section 167(*l*) of the Internal Revenue Code, added by the Tax Reform Act of 1969, § 441(a). *Mars Hill & Blaine Water Co. v. Public Utilities Commission, supra,* 397 A.2d at 578–79. Continental argues that the flow-through of the benefits of accelerated depreciation for state income tax purposes violates federal and state income tax law and policy. We considered and rejected similar arguments in *Central Maine Power Co. v. Public Utilities Commission,* Me., 382 A.2d 302, 318–21 (1978). Our decision in that case compels resolution of this issue in the Commission's favor. *See also Mars Hill & Blaine Water Co. v. Public Utilities Commission, supra,* 397 A.2d at 579.

### III. *Toll Settlements*

At the time of the proceedings before the Commission, Continental served approximately 24,000 customers in 46 exchanges scattered throughout the State of Maine. More than 350,000 other telephone subscribers in the state are served by New England Telephone and Telegraph Company ("New England"), an operating subsidiary of American Telephone and Telegraph Company or the "Bell System". Physical connections between the telephone lines of these two telephone companies provide Continental's subscribers with access to telephone subscribers outside Continental's service territory. It is standard practice for different telephone companies to connect their lines in order to provide more extensive and complete service to their subscribers. In fact, the Commission may order such connections upon a finding that the "public convenience and necessity will be subserved thereby." 35 M.R.S.A. § 251. The Commission also has authority to regulate the joint rates, tolls and charges imposed upon subscribers with respect to such intercompany calls, and to provide for the division of joint rates, tolls or charges ("toll settlements")

upon failure of the telephone companies involved to reach an agreement for such division. 35 M.R.S.A. §§ 51, 251.

In this case an agreement concerning toll settlements apparently exists between Continental and New England. However, neither the contract itself nor any of its specific provisions is included in the record of the proceedings before the Commission.

From the testimony and exhibits in the record and the briefs of the parties, we are able to derive a simplified general description of the toll settlement process. When a toll call involves the use of both Continental and New England telephone facilities, New England initially collects the entire joint rate. If the joint rate is incurred by a New England subscriber, New England directly bills the subscriber. If the joint rate is incurred by a Continental subscriber, Continental bills the subscriber and transfers the amount of the payment to New England. Once New England has collected the joint rates for a specific accounting period, it reimburses Continental according to a toll settlement formula, as provided by contract. Continental appears to be on a cost-basis settlement method with New England. New England reimburses Continental its "costs" or expenses incurred with respect to rendering the toll service, plus a "return" on its plant investment used in providing Continental's portion of the toll service.

Toll revenues constitute the payments received by Continental pursuant to its toll settlement agreement with New England. When determining whether a specific rate design will generate sufficient revenues to attain the revenue level set by the Commission in its rate decision, the Commission considers toll revenue as one source contributing to Continental's gross revenues.[4] If the amount of toll revenue decreases, more revenue from the ratepayers will be needed for Continental to attain the revenue level set by the Commission.[5]

---

4. *See New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8, 62 (1978).

5. For discussion of the relationship between "revenue level" and "rate design," *see New*

Continental's toll revenues are the amount of New England's reimbursement to Continental for expenses incurred in rendering the toll service, plus return on plant investment devoted to rendering such service. Therefore, a decrease in Continental's "expenses" as defined in the Continental-New England toll settlement contract, results in a decrease in toll revenues Continental receives from New England. The Commission's brief recognizes that a known decrease in expenses for toll settlement purposes, and consequently in toll revenue, should be considered by the Commission in setting Continental's rates. However, the Commission argues that it cannot make such an adjustment when it is not provided with the terms of the toll settlement contract and hence cannot determine what constitutes an "expense" of Continental as defined in that contract.

In this case Continental presented evidence to the Commission establishing its toll revenue for the 1975 test year. Mr. Gary R. Osborne, Continental's expert witness on revenues and expenses, adjusted the test-year toll revenue to reflect known changes in certain expenses for toll settlement purposes. The Commission accepted those adjustments as reasonable. *Re Continental Telephone Company of Maine*, 18 P.U.R. 4th 636, 644 (Me.Pub.Util.Comm'n 1977). Those toll revenues, as adjusted by Mr. Osborne, were apparently used by the Commission in determining Continental's gross annual revenues for rate-making purposes in its decree of January 21, 1977.

In response to Continental's inquiry dated January 26, 1977, the Commission indicated by supplemental order that it had made no adjustment to toll revenue to reflect its disallowance for rate-making purposes of several items of expense. Continental petitioned the Commission for reconsideration of the January 21 decree, requesting a downward adjustment of the 1975 test-year figure for toll revenue in order to reflect the disallowance of the items of expense. Continental argued that the Commission "did not recognize the concomitant decrease in toll revenue" alleged to be the consequence of such disallowance. The appendix to the petition does not include a copy of the toll settlement contract or its pertinent provisions, nor does the petition contain a description of its provisions sufficient to provide a basis for determining whether such a decrease in toll revenue would necessarily result under the contract.

In "Supplemental Order No. 3," dated February 22, 1977, the Commission denied Continental's petition for reconsideration, responding to the toll revenue issue as follows:

"Point one of the Company's Petition states that the Commission failed to consider the effect on toll revenue of adjustments to net operating income in the amount of $395,918. While it is true the Commission did not make a corresponding adjustment to toll revenue as a result of its adjustments to net operating income for rate-making purposes (see Decree, p. 23 and Supplemental Order No. 2), the Commission finds that no such adjustments are required or necessary. The Company computes toll settlements on a cost settlement basis. Unlike ongoing adjustments to reflect an actual change in the level of expenses (i. e., change in depreciation rates, wage increase or increased postage expense), or a change in the settlement procedure itself, the Commission's rate-making adjustments to reflect a 31.4% effective Federal income tax rate, charitable contributions, lobbying expense, flow-through of State income taxes and airplane expense, have no effect on the actual cost basis used to compute cost settlement payments from New England Telephone and Telegraph Company. The actual toll revenues received by Continental, computed on a book cost basis, will not change as a result of these adjustments which reflect pragmatic policy decisions for rate-making purposes. Actual book costs, and hence toll settlements, will remain the same. The Com-

*England Telephone & Telegraph Co. v. Public Utilities Commission, supra* note 4, at 58–60;

*Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 322–25 (1978).

pany's first point is without merit and cannot form a basis for this Commission to reconsider, alter or amend its January 21, 1977 decision."

Continental now limits its toll revenue argument before this Court to the Commission's treatment of state income tax expense. The Commission's decree ordered the "flow through" to Continental's ratepayers of the benefits of accelerated depreciation for state income tax purposes in the amount of $47,070, with a resulting decrease of $47,070 in state income tax expense for rate-making purposes. Continental claims that the Commission's failure to recognize a concomitant decrease in toll revenue constitutes error.

We find no error in the Commission's treatment of the toll revenue issue in this case. Although Continental argues that the Commission's disallowance of $47,070 in state income tax expense for rate-making purposes will result in a decrease in its toll revenue, it has presented no factual evidence that necessitates such a finding. The record lacks any evidence concerning precisely what constitutes a state income tax "expense" for toll settlement purposes. Mr. Osborne testified that adjustments must be made to the 1975 test-year toll revenue figure to reflect changes in expenses. He also testified that "any downward adjustment of expense levels will result in a downward adjustment of toll revenue" and that "for every dollar of expense applicable to toll operations, the Company receives a dollar of toll revenue in the cost settlement." However, he never explained what constitutes an "expense applicable to toll operations."

■ The utility bears the burden of proof before the Commission and this Court to show the reasonableness of the rates it seeks. 35 M.R.S.A. §§ 69, 307; *Casco Bay Lines v. Public Utilities Commission,* Me., 390 A.2d 483, 493 (1978). Continental bears that burden in this case, in seeking to establish that it is entitled to an adjustment compensating for an alleged decrease in toll revenue.

■ Whether and to what extent a particular item should be included as an "expense" for toll revenue purposes depends on how "expenses" are defined in the toll settlement contract between Continental and New England. Continental has not shown that the state income tax expense allowed by the Commission for rate-making purposes automatically determines the amount attributable to state income tax expense for toll settlement purposes (*i. e.,* as defined in the toll settlement contract).

In effect, Continental contends on appeal that its state income tax expense for toll revenue purposes tracks the state income tax expense allowed by the Commission for rate-making purposes. However, Continental produced no evidence to that effect. The toll settlement contract might provide that toll revenue shall be determined on the basis that Continental is normalizing for state income tax purposes regardless of what the Commission orders for rate-making purposes. Without evidence as to the substance of that contract, Continental cannot successfully maintain that the effect of the Commission's action is to reduce its expenses for toll revenue purposes or that the Commission's failure to adjust toll revenue to reflect its disallowance of $47,070 in state income tax expense is unreasonable. *Cf. Casco Bay Lines v. Public Utilities Commission, supra* at 488. Continental has not met its burden of showing that it is entitled to the toll revenue adjustment it seeks.

In its reply brief, Continental claims that it offered no proof concerning the effect of the flow-through on toll revenue "because no proof was offered by *anyone* to the effect that the State income tax adjustment should be made, or that one was proper." Moreover, Continental argues, even if it had become clear at some point in the proceedings that the Commission might "adopt the flow-through principle for State income taxes, it could not be clear that the Commission would ignore its responsibility of recognizing the concomitant loss of toll revenues that would result from the flow-through adjustment."

We are not persuaded by these arguments. The Commission's decision to flow through the benefits of accelerated depreciation for state income tax purposes was a continuation of a rate-making policy it had already established several months earlier in *Re New England Telephone & Telegraph Co.*, 13 P.U.R. 4th 65 (Me.Pub.Util.Comm'n Feb. 13, 1976) and had consistently applied thereafter in the 1976 series of General Waterworks rate cases[6] and in *Re Central Maine Power Co.*, 15 P.U.R. 4th 455 (Me. Pub.Util.Comm'n Sept. 1, 1976). Hearings in Continental's rate proceedings were held in September, November, and December of 1976. The transcript of the hearing on November 3, 1976, makes it clear that counsel for Continental was aware of the Commission's recent decisions requiring flow-through with respect to state income taxes. Continental had sufficient opportunity to introduce adequate evidence concerning the anticipated effect, if any, of such flow-through on its toll revenue. Continental may not charge the Commission with the responsibility for making a toll revenue adjustment when Continental did not present adequate evidence for the Commission to be able to make a reasoned determination that such an adjustment was appropriate. The burden-of-proof requirement in 35 M.R.S.A. §§ 69 and 307 may not be thus disregarded.

Even in its petition for reconsideration, Continental did not offer to introduce any evidence about the effect of the Commission's actions on its toll revenue. Although it appended to the petition a computation purporting to show the dollar effect of the Commission's decision on toll revenue, Continental did not show, by reference to the toll revenue settlement contract, that the figures in the computation correctly represented the impact on its toll revenue of the Commission's decision. Thus, Continental failed to substantiate before the Commission its claim that the flow-through order resulted in a loss of toll revenue. As we said in *Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483, 487 (1978):

"[T]he Commission must be afforded the opportunity to consider a utility's objections to its methodology, and to exercise its expertise and judgment in response to articulated objections and recommendations by the utility. We will not overrule the Commission on an issue which was not adequately presented for its consideration during the proceedings below."

In conclusion, we reject Continental's claim that the absence from the Commission's decree of an adjustment to toll revenue to reflect the Commission's disallowance of $47,070 in state income tax expense for rate-making purposes constitutes error.[7]

Continental's section 305 complaint presents other claims of error that were not briefed or argued before this Court. Such claims of error must be deemed waived or abandoned. *Harrington v. Inhabitants of Town of Garland*, Me., 381 A.2d 639, 642 (1978); *MacArthur v. Dead River Co.*, Me., 312 A.2d 745, 746 (1973).

The entry is:

Section 303 appeals denied; decree and order of Public Utilities Commission affirmed.

Judgment for defendants on section 305 complaint.

McKUSICK, C. J., did not sit.

ARCHIBALD and DELAHANTY, JJ., did not sit.

DUFRESNE, A. R. J., sat by assignment.

---

6. *See Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1102–03 (1977).

7. *Cf. Public Serv. Comm'n v. Continental Tel. Co.*, —— Nev. ——, 580 P.2d 467 (1978) (Nevada commission upheld in disallowing toll revenue adjustment as insufficiently substantiated).