**MARS HILL & BLAINE WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

**WALDOBORO WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

**GREENVILLE WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

**NORTHERN WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

**EASTPORT WATER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION.**

Supreme Judicial Court of Maine.

Feb. 2, 1979.

---

Verrill & Dana by Roger A. Putnam (orally), John R. McKernan, Jr., Portland, for plaintiffs.

David J. Fletcher, Calais, for amicus curiae, City of Eastport.

Thomas R. Gibbon (orally), Horace S. Libby, Public Utilities Comm'n, Augusta, for defendant.

Before POMEROY, WERNICK, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

GODFREY, Justice.

Mars Hill & Blaine Water Company, Waldoboro Water Company, Greenville Water Company, Northern Water Company, and Eastport Water Company ("Water Companies") seek this Court's review of certain decisions rendered by the Public Utilities Commission during 1977 in their rate cases. We affirm the Commission's decision in each of those cases.

Each of the Water Companies is a member of the same family of water companies certain members of which sought review of Commission actions in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). The Water Companies are subsidiaries of General Waterworks Corporation ("General Waterworks") which, in turn, is wholly owned by I. U. International Corporation ("I. U. International").

The procedural posture of these companies is substantially similar to that of their sister companies in *Mechanic Falls Water Co. v. Public Utilities Commission, supra.* Between April and August of 1976, each of the Water Companies filed with the Com-

mission both a schedule of proposed increased rates and a complaint against itself alleging that its existing rates were unreasonable, unjust, inadequate, and unjustly discriminatory. Pending a final determination, the Commission suspended the proposed rates of each company, pursuant to 35 M.R.S.A. § 69, for an initial three-month period and then for an additional five-month period.

On November 8, 1976, in response to motions by the Commission's staff and the Water Companies, the Commission ordered that the individual rate cases be consolidated for hearing and resolution of certain common issues. The consolidated hearings were held on December 14, 15, and 16, 1976, and on January 12 and 24, 1977.

On November 30, 1976, the City of Eastport, a customer of the Eastport Water Company, filed a petition to intervene, which was granted on December 14, 1976. Because the City of Eastport was generally satisfied with the Commission's decision, it did not participate in the early stages of the proceedings in the Law Court. However, on November 21, 1977, the City filed with this Court a "Motion to File Brief as Intervener or Amicus Curiae," limited to the sole issue of the correct tax rate to be applied for determining Eastport Water Company's federal income tax expense. The motion was granted on November 22, 1977, by order of Justice Pomeroy for the Court.

On January 26, 1977, the Commission issued a preliminary decision in Mars Hill & Blaine Water Company's application for a rate increase, authorizing the filing of new rates substantially below those requested by the company.

The Commission issued its final decision with respect to Mars Hill & Blaine Water Company on February 18, 1977. *Re Mars Hill & Blaine Water Co.*, 19 P.U.R. 4th 380 (Me. Pub. Util. Comm'n 1977). Because the final decree granted Mars Hill & Blaine Water Company only $86 more in revenues than the preliminary decree, the company chose not to revise its schedule of rates already put into effect pursuant to the preliminary decree.

The Commission's decree of February 18, 1977, also included its final decisions on the consolidated issues, which are now the subject of review in this case. These decisions were incorporated into the individual decrees issued for the other four Companies: Waldoboro Water Company (March 2, 1977), Greenville Water Company (March 2, 1977), Northern Water Company (April 27, 1977), and Eastport Water Company (May 18, 1977).

The Water Companies seasonably initiated the instant proceedings for judicial review by invoking this Court's "appeal" jurisdiction under 35 M.R.S.A. § 303[1] and its "complaint" jurisdiction under 35 M.R.S.A. § 305.[2] Because the issues before this Court are the same in each case, the parties filed a motion for consolidation, which was granted by Justice Pomeroy for the Court on September 22, 1977. Oral arguments were presented on December 19, 1977.

Some of the issues arising from the proceedings below are identical to issues raised by the General Waterworks subsidiaries involved in *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* which was then pending before this Court. The parties have agreed to waive briefs and oral argument and to be bound by the decision of this Court in the *Mechanic Falls* case with respect to the following matters: management and service fees, depreciation on contributed property, allocation of rate

1. Section 303 provides in pertinent part:
 "An appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action."

2. Section 305 provides in pertinent part:
 "Notwithstanding sections 303 and 304, in all cases in which the justness or reasonableness of a rate, toll or charge by any public utility or the constitutionality of any ruling or order of the commission is in issue, the law court shall have jurisdiction upon a complaint to review, modify, amend or annul any ruling or order of the commission, but only to the extent of the unlawfulness of such ruling or order."

case costs, staff participation in Commission actions, and the chronic tax loss theory for calculation of an effective federal income tax rate. The parties' agreement was embodied in the Law Court's order of September 22, 1977. Our decision in *Mechanic Falls* resolved all those matters in favor of the Commission.

We shall now consider the substantive issues remaining in this case, guided by the appropriate standard of review under 35 M.R.S.A. §§ 303 and 305, as discussed in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 15 (1978), and *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1090–91.

## I. *Averaging of Annual Effective Federal Income Tax Rates*

The Water Companies filed federal income tax returns on a consolidated basis with I. U. International in the same manner and to the same effect as their sister water companies in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). In that case we held that the Commission could disregard the standard 48 per cent federal corporate income tax rate in determining their federal income tax expense for rate-making purposes, and, instead, employ a lower "effective tax rate" which reflects their proportionate share of the consolidated group's actual tax liability. Our opinion contained a thorough discussion of the issues involved and warrants no repetition or expansion here. *See also Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 494–95 (1978). The Water Companies are bound by this determination of the propriety of the effective tax rate approach by the Law Court's consolidation order of September 22, 1977.

In *Mechanic Falls Water Co. v. Public Utilities Commission, supra*, we approved the Commission's calculation of an effective

tax rate of 28 per cent for 1974, which was used to determine the companies' federal income tax expense for rate-making purposes. In the present case the Commission determined that the effective tax rate for 1975 was 36.84 per cent.[3] Then, the Commission "averaged" the 1974 and 1975 effective tax rates to produce a 33 per cent tax rate for purposes of determining the Water Companies' federal income tax expense for rate-making purposes.[4]

The Water Companies challenge the Commission's calculation of a 33 per cent effective tax rate on two grounds: First, they argue that the Commission's "averaging" of the individual effective tax rates for 1974 and 1975 was, in and of itself, unjustified. Second, they claim that the Commission's averaging approach constituted a change in past rate-making policy, requiring sufficient notice thereof, which, they argue, was not provided in this case. We reject each of these contentions.

■ As this Court recently emphasized in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8 (1978), we must give considerable deference to the rate-making methods employed by the Commission.

"As we repeatedly emphasize throughout this opinion, the Legislature has vested the Commission with the authority and duty to exercise its expertise and skill in the setting of just and reasonable rates. The Commission must necessarily be allowed to exercise wide discretion in setting rates, which is essentially a legislative function. Our role upon review is limited to the consideration of errors of law. We may not interfere with the Commission's findings if the methodology and result are reasonable and are supported by substantial evidence in the record. The Commission may exercise reasonable discretion in selecting methods by

---

3. The Water Companies do not challenge the Commission's determination that the effective tax rate for 1975 is 36.84%.

4. Neither do the Water Companies challenge the Commission's calculation that the average

of 28% and 36.84% is 33%. The accurate calculations show the average of 28% and 36.84% if 32.42%. Obviously the higher rate of 33% works for their benefit.

which to establish just and reasonable rates. It is not bound to any particular methodology, whether suggested by its own Staff or by the utility." *Id.* at 48–49.

Accordingly, choice of methods to compute such factors as the effective tax rate belongs to the Commission, at least in the realm where rational persons could disagree. *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 317 (1978). Therefore, our review is limited to whether the Commission's methodology and result were reasonable and whether they were supported by substantial evidence.

As the evidence indicates, the effective tax rate of a consolidated system, calculated on the "chronic loss" theory approved in *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* may be subject to considerable fluctuation from year to year. In fact, the Water Companies' own witness, David Surwit, stated that utility rates, based upon an annual single effective tax rate, would have a tendency "to bounce up and down like a yo-yo."

■ In *Central Maine Power Co. v. Public Utilities Commission*, 382 A.2d at 317, we stated:

"This Court has made clear, in the context of regulating this very public utility, that the experience of one test year is not the sole factor to be considered by the Commission."

*See also New England Telephone & Telegraph Co. v. Public Utilities Commission*, 390 A.2d at 49–50. Because rate making is prospective in nature, the Commission should not limit itself to the utility's experience during any single year when such a limitation would produce an inaccurate assessment of its true financial situation. *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 236, 136 A.2d 726, 732 (1957). It is reasonable and proper for the Commission to assess a utility's effective annual federal income tax rate over a period of years in order to determine an average effective tax rate for the setting of rates to be effective in the future.

This is not a case in which the Commission is "splitting the difference" between conflicting figures endorsed by its staff and the utility. *See Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483, 488–89 (1978).[5] Rather, the Commission has reasonably determined that a more proper effective tax rate may be calculated by averaging the individual effective tax rates for the past two years. "Ratemaking is not an exact science and often calls for estimations and predictions." 390 A.2d at 494.

■ The methodology used by the Commission in its rate-making determinations need not be suggested by any witness in the record.[6] The methodology itself lies within the Commission's expertise and discretion, and is subject only to a test of reasonableness. If the methodology is reasonable, then the result will not be disturbed if the factual findings employed in that methodology are supported by the record. In the circumstances, we cannot find that the Commission's method is unreasonable.

■ We also find that the record adequately supports the Commission's determination. The Commission was warranted in finding a 28 per cent effective tax rate for the I. U. International consolidated system in 1974. The Commission simply took official notice of its finding in *Re Mechanic Falls Water Co.*, 13 P.U.R. 4th 347 (Me. Pub. Util. Comm'n 1976), which finding we subsequently approved in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). The 1975 effec-

**5.** We did not reach the merits of the utility's challenge to the Commission's averaging of annual expense figures in the *Casco Bay Lines* case. *See* 390 A.2d at 487.

**6.** *However*, we do find the following statement in Dr. Shipman's *Mechanic Falls* testimony, which was incorporated into the record in the proceedings below:

"Perhaps it goes without saying that an examination of the tax information for the years 1970–1973 should be undertaken to determine whether there is any consistency in the apparent tax rate, and to arrive at an average figure for the five-year period."

tive tax rate of 36.84 per cent was derived from calculations based on the same formula used by the Commission in the *Mechanic Falls* case. *Re Mars Hill & Blaine Water Co.*, 19 P.U.R. 4th 380, 384 (Me. Pub. Util. Comm'n 1977).[7] We find that the record provides sufficient support for the Commission's use of those figures.

We hold that the Commission's method of averaging effective tax rates was reasonable and that substantial evidence supports the findings of the facts to which the method was applied. We find no substantive error in its averaging of effective tax rates in this case.

The Water Companies' second objection to the Commission's averaging of effective tax rates is that this allegedly novel approach was used by the Commission without adequate notice or opportunity to be heard on the issue. The Water Companies cite *New England Telephone & Telegraph Co. v. Department of Public Utilities*, 371 Mass. 67, 354 N.E.2d 860, 871 (1976), for the principle that a utility commission should not make a major change in rate-making policy without sufficient warning to the utility involved in order that it may prepare its presentation.

Although this Court has held that the Commission is not bound by rate-making policies used in prior cases, *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 390 A.2d at 55; *Central Maine Power Co. v. Public Utilities Commission*, 382 A.2d at 319, we have also recognized that the affected utility is entitled to notice "sufficient to enable it to present evidence on any issue relevant to that proceeding." *Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1103. Moreover,

"Where . . . the Commission is contemplating a change in a long-stand-

ing policy which would adversely affect a utility, a general notice of a rate proceeding may not be sufficient. . . . In such circumstances, due process may require a more particularized notice so that the utility could introduce evidence on that issue if it so desires." *Id.*

■ The Water Companies must make three showings in order to substantiate their claim of denial of such due process: (1) that "the Commission is contemplating a change in a long-standing policy which would adversely affect a utility"; (2) that the utility did not receive a sufficiently "particularized notice" of the contemplated change; and, (3) that the lack of such notice subjected the utility to "substantial prejudice."

■ The Water Companies have not made even the first of those showings. They have failed to show that the Commission's averaging of annual effective tax rates constituted a change in policy. The Commission introduced the effective-tax-rate approach in *Re Mechanic Falls Water Co.*, 13 P.U.R. 4th 347 (Me. Pub. Util. Comm'n, Jan. 26, 1976), only a few months before the Water Companies submitted their rate increase requests. The effective tax rate theory was still in its formative stages at the time of the proceedings below. No real change in policy occurred. Rather, the Commission was already using an average effective tax rate in those circumstances where the annual effective tax rates for more than one year were properly before it. The Water Companies do not disprove the Commission's assertion that in *Re Mechanic Falls Water Co., supra,* and in *Re Continental Telephone Co.*, 18 P.U.R. 4th 636 (Me. Pub. Util. Comm'n, Jan. 21, 1977), there was only one annual effective tax rate available from the record.[8] On the other hand, in *Re*

---

7. During the proceedings below, the Commission ordered the Water Companies to compute their effective tax rate for 1975 based on the formula developed in *Mechanic Falls* and to supply the background data, calculations, and results to the Commission. The calculations submitted by the Water Companies pursuant to the Commission's order showed a 1975 effec-

tive tax rate of 36.59%. On appeal, the Water Companies have not questioned this discrepancy between their calculation and the Commission's figure of 36.84%.

8. Although the Water Companies claim that in the *Mechanic Falls* case the Commission had before it the consolidated system's tax return

*Maine Water Co.*, (Me. Pub. Util. Comm'n, F.C. No. 2156, July 2, 1976), *aff'd Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493 (1978), and in *Re Camden and Rockland Water Co.*, (Me. Pub. Util. Comm'n, F.C. No. 2132, March 26, 1976), where the Commission had available from the record effective tax rates for more than one year, it averaged such effective tax rates.

Therefore, by averaging the 1974 and 1975 effective tax rates in this case, the Commission was following a policy which it had recently formulated and was currently applying. The Water Companies cannot now successfully claim that there was a change in policy of which they had no notice.[9]

We hold that the Commission committed no error in its calculation of a 33 per cent effective tax rate for purposes of determining the Water Companies' federal income tax expense for rate-making purposes.

## II. *Flow-Through of Income Taxes Deferred Because of Accelerated Depreciation*

■ This Court is again confronted with the Commission's treatment of the depreciation deduction for purposes of determining the proper income tax expense for rate-making purposes. In three recent cases, we have considered carefully the arguments with respect to "normalization" versus "flow-through" methods of accounting, especially in the light of I.R.C. § 167(*l*) (1978) (Tax Reform Act of 1969 § 441(a)): *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 15–25 (1978); *Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302, 318–21 (1978); *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1100–03 (1977). *See also Central*

*Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 246–49, 136 A.2d 726, 737–39 (1957).

In its decision below, the Commission continued the policy it established in *Re Central Maine Power Co.*, 15 P.U.R. 4th 455 (Me. Pub. Util. Comm'n 1976), *aff'd, Central Maine Power Co. v. Public Utilities Commission*, Me., 382 A.2d 302 (1978), that the benefits of accelerated depreciation with respect to state income taxes would be "flowed through" to the Water Companies' rate-payers. The Commission also ordered the flow-through of the benefits of accelerated depreciation with respect to federal income taxes on both pre-1970 and post-1969 public utility property.

With only a general policy discussion of the merits of normalization versus flow-through, the Water Companies' brief challenges the Commission's decision to flow through all the benefits of accelerated depreciation for federal and state income tax purposes. Over twenty years ago, in *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 136 A.2d 726 (1957), we held that for rate-making purposes the Commission could properly require flow-through of the benefits of accelerated depreciation. We reaffirmed that holding in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080 (1977). Recent cases have focused on the effect of § 167(*l*) of the Internal Revenue Code on a utility's continued ability to take advantage of accelerated depreciation. Where we have found no conflict between the Commission's actions and section 167(*l*), we have continued to leave the treatment of accelerated depreciation to the Commission's discretion and expertise. *Central Maine Power Co. v. Public Utilities Commission, supra* (1978); *Mechanic Falls Water Co. v. Public Utilities Commission,*

---

data for 1970 through 1974, the Commission's decree in that case states:

"No party presented testimony concerning an effective tax rate for years other than 1974 and 1973. The only testimony concerning an effective tax rate for 1973 was a rough calculation without Mr. Clougherty's adjustments. Nevertheless, this rough calculation showed

that an effective tax rate for 1973, using Dr. Shipman's method, would be close to that of 1974." *Re Mechanic Falls Water Co., supra* at 355.

9. Moreover, the Commission's "Notice of Consolidated Hearing" dated November 8, 1976, designated as one issue for resolution "the proper federal income tax rate."

*supra* (1977). On the other hand, where we have found that the Commission's actions arbitrarily "jeopardized" a utility's ability to take accelerated depreciation under section 167(*l*), we have held the Commission's actions to be an unreasonable exercise of power and abuse of discretion. *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* (1978).

In this case we find no incompatibility between the Commission's actions and the provisions of section 167(*l*) of the Internal Revenue Code and therefore uphold the Commission's exercise of its rate-making power.

### A. State Income Taxes

■ In *Central Maine Power Co. v. Public Utilities Commission, supra* (1978), this Court held that federal income tax law, as expressed in section 167(*l*), had no controlling effect upon the Commission's treatment of the benefits of accelerated depreciation for state income tax expense purposes. That issue remains a matter of state law. Thus, the Commission's decision in this respect must be sustained under the authority of *Central Maine Power Co. v. Public Utilities Commission, supra* (1978), and *Central Maine Power Co. v. Public Utilities Commission, supra* (1957).

### B. Federal Income Taxes—Pre-1970 Property

■ In *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1101 (1977), we discussed the operation of section 167(*l*)(1), which concerns pre-1970 public utility property: [10]

"For pre-1970 property, the Code provides that a utility may use 1) straight-line depreciation, 2) the method used prior to August of 1969 if it also employs normalization, or 3) accelerated depreciation with flow-through, but only if that method was used prior to August of 1969. In interpreting the pre-1970 utility property provision, the United States Supreme Court has declared that a utility may not unilaterally switch from flow-through to normalization. Rather, if a utility is flowing through the benefits of accelerated depreciation, it must continue to do so unless the appropriate regulatory body permits a change. *Federal Power Commission v. Memphis Light, Gas and Water Division,* 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973)."

If, before August, 1969, the Water Companies were using accelerated depreciation with flow-through, they must continue to flow through the benefits of accelerated depreciation with respect to pre-1970 property, unless permitted to change to normalization by the Commission. Moreover, "The burden was on the Companies to convince the Commission that a change from flow-through to normalization would be in the public interest." *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* at 1101.

■ In its decree, the Commission notes that the Water Companies provided no evidence or documentation as to the method of accounting used during the July, 1969, accounting period. *See Re Mars Hill &*

---

**10.** I.R.C. § 167(*l*)(1) provides:

"(1) Pre-1970 public utility property.—
(A) In general.—In the case of any pre-1970 public utility property, the term "reasonable allowance" as used in subsection (a) means an allowance computed under—
(i) a subsection (*l*) method [straight-line depreciation], or
(ii) the applicable 1968 method [the method used prior to August of 1969] for such property.
Except as provided in subparagraph (B), clause (ii) shall apply only if the taxpayer uses a normalization method of accounting.
(B) Flow-through method of accounting in certain cases.—In the case of any pre-1970

public utility property, the taxpayer may use the applicable 1968 method for such property if—
(i) the taxpayer used a flow-through method of accounting for such property for its July 1969 accounting period, or
(ii) the first accounting period with respect to such property is after the July 1969 accounting period, and the taxpayer used a flow-through method of accounting for its July 1969 accounting period for the property on the basis of which the applicable 1968 method for the property in question is established."

*Blaine Water Co.,* 19 P.U.R. 4th 380, 389 (Me. Pub. Util. Comm'n 1977).[11] The Water Companies may thus be treated as if they used a flow-through method of accounting prior to August, 1969, in accordance with the Commission's long-standing policy of flowing through the benefits of accelerated depreciation. *See* 35 M.R.S.A. § 307. Moreover, at the time of the proceedings before the Commission, there was no showing that the Commission had ever permitted the Water Companies to change to a normalization method of accounting. The burden was therefore on the Water Companies to seek the Commission's permission to change from a flow-through to a normalization method of accounting.

The choice between flow-through and normalization rests in the sound judgment of the Commission. *Central Maine Power Co. v. Public Utilities Commission, supra* (1957). On the basis of the record we cannot find that the Water Companies have sustained their burden of showing that the Commission abused its discretion in deciding to require the flow-through of the benefits of accelerated depreciation for pre-1970 property. *See Mechanic Falls Water Co. v. Public Utilities Commission, supra* at 1102.

### C. *Federal Income Taxes—Post-1969 Property*

With respect to post-1969 public utility property, the Internal Revenue Code provides that a utility may use as a method of depreciation:

"(A) a subsection (*l*) method [straight-line depreciation],

(B) a method otherwise allowable under this section [accelerated depreciation] if the taxpayer uses a normalization method of accounting, or

(C) the applicable 1968 method [the method used prior to August of 1969], if, with respect to its pre-1970 public utility property of the same (or similar) kind

most recently placed in service, the taxpayer used a flow-through method of accounting for its July 1969 accounting period." I.R.C. § 167(*l*)(2).

If the conditions provided by subparagraph (C) are met, the Commission may, in its discretion, require a public utility to use accelerated depreciation with flow-through for post-1969 property for rate-making purposes without jeopardizing the utility's right to take accelerated depreciation.

In paragraph (4)(A) of section 167(*l*) of the Code Congress provided a method by which utilities could avoid the effect of paragraph (2)(C), set forth above:

"If the taxpayer makes an election under this subparagraph before June 29, 1970, in the manner prescribed by the Secretary, in the case of taxable years beginning after December 31, 1970, paragraph (2)(C) shall not apply with respect to any post-1969 public utility property, to the extent that such property constitutes property which increases the productive or operational capacity of the taxpayer with respect to the goods or services described in paragraph (3)(A) and does not represent the replacement of existing capacity." I.R.C. § 167(*l*)(4)(A).

If the Water Companies had made a valid election under this subparagraph, the available depreciation methods would be limited to those provided in § 167(*l*)(2)(A) and (B), namely, straight-line depreciation or accelerated depreciation with normalization. Treas.Reg. § 1.167(*l*)–2(a)(1) (1978). *See Federal Power Commission v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 93 S.Ct. 1723, 36 L.Ed.2d 426 (1973). In the present case, the Water Companies did not produce evidence that they had made any election under paragraph (4)(A).

The flow-through of the benefits of accelerated depreciation on post-1969 property was at issue in *New England Telephone &*

---

11. The decree provides an opportunity to the *Water* Companies to submit documentation with respect to their accounting methods. 19 P.U.R. 4th at 389. In a letter dated 10 days after the Commission's decree counsel for the Water Companies reserved the right to provide the documentation. However, the record and briefs contain no indication that such information was ever provided.

*Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8 (1978). In that case, New England Telephone, which had been using a straight-line depreciation method, switched from straight-line to accelerated depreciation with normalization on its post-1969 property. Thus, paragraph (2)(C) of section 167(*l*) was not applicable because New England Telephone had not used a flow-through method of accounting for its July, 1969, accounting period. We held that the Commission abused its discretion in requiring flow-through of the benefits of accelerated depreciation for rate-making purposes while ordering the Company to continue using a normalized method of accounting in its regulated books of account.

The present case differs from *New England Telephone* in a crucial respect: Unlike New England Telephone, the Water Companies were subject to the operation of paragraph (2)(C) of I.R.C. § 167(*l*).

As we noted in the discussion of pre-1970 property, above, the Commission could properly act on the basis that before August, 1969, the Water Companies' rates had been determined by using accelerated depreciation with flow-through and thus the conditions for application of I.R.C. § 167(*l*)(2)(C) have been satisfied. Nothing in I.R.C. § 167(*l*) prevents the Commission from determining the Water Companies' rates on the basis of accelerated depreciation with flow-through for post-1969 property.

In conclusion, we find no error or abuse of discretion in the Commission's requiring that, for rate-making purposes, the Water Companies flow through the benefits of both state and federal accelerated depreciation.

### III. *Rate of Return*

■ As we explained in *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080, 1095 (1977), a

utility must be allowed sufficient revenues both to meet its operating expenses and to provide a proper return on investment. In this case the Commission calculated the Water Companies' return by multiplying the utility's rate base by the rate of return found by the Commission to be appropriate.[12] This Court has regarded capital cost, when competently computed, as "essentially and practically the equivalent of fair rate of return." *Central Maine Power Co. v. Public Utilities Commission,* 156 Me. 295, 307, 163 A.2d 762, 769 (1960). Accordingly, the Commission determined the rate of return for the Water Companies by analyzing their cost of capital.

The cost of capital is calculated by determining the separate costs of the different items composing the capital structure of the utility. A weighted cost for each item is derived by multiplying the cost of that item by its ratio to the total capital. Those weighted costs are then added to produce the utility's overall cost of capital as the basis for an appropriate rate of return. *See New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8, 32–33 (1978).

■ Before proceeding to its determination of the cost of capital, the Commission must decide upon which corporate entity it will focus its analysis. Like their sister water companies in *Mechanic Falls Water Co. v. Public Utilities Commission, supra,* the Water Companies here are substantially wholly owned by General Waterworks Corporation. The Water Companies appear to have little, if any, debt outstanding, their capitalization consisting almost entirely of common equity supplied by General Waterworks.

General Waterworks in turn is ultimately wholly owned by I. U. International Corporation, a large conglomerate with holdings both inside and outside the utility field. General Waterworks' actual capital structure at the time of the Commission hearings

---

12. Where less "capital-intensive" utilities, such as transit utilities, are concerned, the proper return to investors may be determined by means of an "operating ratio" rather than by

means of a "rate of return." *See Casco Bay Lines v. Public Utilities Commission,* Me., 390 A.2d 483, 490–91 (1978).

appeared to consist of 57% debt and 43% common equity. General Waterworks does its financing primarily through the issuance of debt and does not appear to have issued any equity since 1970.

During the proceedings before the Commission, the Water Companies' testimony focused on General Waterworks' cost of capital as the appropriate measure of rate of return. The Companies' witness, Mr. Mulle, recommended the use of General Waterworks' actual capital structure, consisting of 57% debt and 43% equity ("57/43 capital structure"). Mr. Mulle's calculations of cost of equity were based on the cost of equity for General Waterworks. The Water Companies agreed with the Commission that the appropriate cost of debt was 8.0%, determined on the same basis as General Waterworks' cost of debt in *Re Mechanic Falls Water Co.,* 13 P.U.R. 4th 347 (Me. Pub. Util. Comm'n 1976).

The Commission found that the appropriate capital structure to be used for cost of capital determinations was the 60% debt and 40% equity ("60/40 capital structure") it had used for General Waterworks in *Re Mechanic Falls Water Co., supra.* Applying the "discounted cash flow" ("DCF") formula to figures developed with respect to I. U. International's common equity, the Commission staff recommended a cost of equity between 12.0% and 12.6%. The Commission found that the cost of debt was the undisputed 8% and that the cost of equity was 12.0%. The Commission applied these costs to the 60/40 capital structure to produce a cost of capital of 9.6%, as follows:

| Item | Capital Structure | Cost | Weighted Cost |
|------|-------------------|------|---------------|
| Debt | 60% | 8.0% | 4.8% |
| Equity | 40% | 12.0% | 4.8% |

Cost of Capital: 9.6%

Accordingly, the Commission concluded that the Water Companies were entitled to a rate of return of 9.6%. The Water Compa-

nies challenge that rate of return as unreasonable and confiscatory, claiming that the minimum fair rate of return should be 10.7%.

We sustain the Commission's finding of a rate of return of 9.6% as reasonable and non-confiscatory. We now review in more detail the individual factors in the Commission's calculations of cost of capital.

## A. *Capital Structure*

In its decree the Commission stated that it was computing the Water Companies' cost of capital "on a 60/40 capital structure." *Re Mars Hill & Blaine Water Co.,* 19 P.U.R. 4th 380, 391 (Me. Pub. Util. Comm'n 1977). The Commission explained its use of a 60/40 capital structure in a footnote:

"In the *Mechanic Falls* case, all parties agreed on a 60/40 capital structure as being consistent with General Waterworks' target level of debt. The company here seeks a 57/43 structure, but we continue to feel that the 60/40 structure is well balanced and consistent with the fact that Maine customers have been paying the higher yield associated with the company's effort to reach the 60/40 structure. *Id.* at 391 n. 11.

The Water Companies now contend that the Commission must use General Waterworks' actual 57/43 capital structure in its cost-of-capital determinations in this case. They argue that the Commission has supplied no findings of fact or justification for its use of any capital structure other than General Waterworks' actual 57/43 capital structure.[13] The facts do not support this argument.

The record supports a finding of the following facts: In response to pressure from regulatory commissions, the management of General Waterworks decided to shift to a 60/40 capital structure. To that end, Gen-

---

**13.** In *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080, 1095 *(1977),* the water utilities and the Commission agreed "that the capital structure of General, consisting of 60% debt and 40% equity, would be used in computing the Companies' fair rate

of return." The use and approval of a 60/40 capital structure in that case does not control the determination of the proper capital structure in this case. *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 252–53, 136 A.2d 726, 740–41 (1957).

eral Waterworks sought review by the Securities and Exchange Commission of a planned change in its bond indenture. The purpose of the change was to allow General Waterworks to pay 100% of its earnings to I. U. International in dividends in order to facilitate attainment of a 60/40 capital structure. To gain the consent of bond holders to a change in the bond indenture, the interest rates on General Waterworks' bonds were adjusted upward by 0.25%. That increase was a factor in computing the cost of debt allowed by the Commission. Thus, the Water Companies' ratepayers were being charged with increased debt costs associated with the effort to reach a 60/40 capital structure. During cross-examination, Mr. Mulle admitted that General Waterworks was still attempting to achieve the 60/40 capital structure.

In *New England Tel. & Tel. Co. v. Public Utilities Comm'n*, Me., 390 A.2d 8, 39 (1978), we recognized two categories of situation in which a utility commission may adopt a capital structure other than the utility's test-year capital structure for purposes of determining its cost of capital. Although the facts of the present case do not fit precisely into either category, the Commission's use of a 60/40 capital structure is supported by the record as constituting a reasonable exercise of the Commission's expert judgment. The record supports the conclusion that General Waterworks was attempting to shift to a 60/40 capital structure and that the ratepayers have been incurring higher debt costs associated with the attempt.[14]

We find support for this approach in *New England Telephone & Telegraph Co. v. Department of Public Utilities*, 360 Mass. 443, 275 N.E.2d 493 (1971). The evidence in that case showed that the utility's debt ratio during the test year of 1969 was 40%, but that a planned issuance of debt during 1970 would raise its debt ratio to about 45%. In its decision the Department allocated a 50% debt ratio to the utility for rate-making purposes. Though the Massachusetts court held that a 50% ratio was excessive, it approved the use of the impending debt ratio in the Department's calculation of the cost of capital, saying:

"We believe that in the determination of rates for future application the Department should have considered the reasonably foreseeable impending change in the debt ratio to 45% and determined whether that was or would be reasonable." 360 Mass. at 468, 275 N.E.2d at 509.

Ratemaking is prospective in nature. With respect to adjustment for attrition, the experience of the test year is not the sole factor to be considered by the Commission. *Central Maine Power Co. v.*

14. The Commission contended on appeal that because it was merely presented with the task of determining an appropriate hypothetical capital structure for the Water Companies the capital structure of which both the Water Companies and the Commission staff chose to disregard, it was not required to provide any specific findings or justifications for disregarding the test-year capital structure of General Waterworks.

We cannot accept that argument. The record demonstrates that the Water Companies' cost of capital was to be determined by using General Waterworks' cost of capital in the context of its appropriate capital structure.

The Commission used General Waterworks' 8.0% cost of debt in its cost-of-capital calculations. Similarly, it determined a cost of equity at 12.0% for General Waterworks. Its decree states, "Because General Waterworks sells no common stock on the open market and because it is wholly owned and controlled ultimately by I. U. International, we will impute the I. U. cost of equity to General Waterworks and apply it to the General Waterworks' capital structure . . . ." *Re Mars Hill & Blaine Water Co.*, 19 P.U.R. 4th 380, 392 (Me. Pub. Util. Comm'n 1977). Moreover, the testimony of Mr. Robert L. Packard, principal witness for the Commission staff on rate of return, indicated that he was calculating the Water Companies' rate of return on the basis of General Waterworks' cost of capital in the context of its own appropriate capital structure. Thus, the Commission focused on the question of the appropriate capital structure to attribute to General Waterworks.

Therefore, we have disregarded the Commission's characterization of the issue on appeal and have proceeded to the real issue before this Court: Was the Commission's imputation of a 60/40 capital structure to General Waterworks, in order to determine its cost of capital, reasonable and supported by substantial evidence in the record?

*Public Utilities Commission*, Me., 382 A.2d 302, 317 (1978); *see also, New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 49 (1978). Also, as we have said in the context of determining allowable utility expenses for rate-making purposes, "facts which with certainty will gain life in the future, but do not affect the operations of the test year, must be weighed by the fact finder . . . ." *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 242, 136 A.2d 726, 735 (1957). The Commission's decision to use a 60/40 capital structure is thus consistent with this Court's past treatment of Commission actions with respect to future expenses and attrition. It is also consistent with rulings of public utility regulating agencies in other jurisdictions; *e. g., Re Southern Natural Gas Co.*, 24 F.P.C. 26, 35 P.U.R. 3d 179 (1960) (actual capitalization adjusted for imminent financing of short-term debt); *Re New York State Electric & Gas Corp.*, 88 P.U.R. 3d 300 (N.Y. Pub. Serv. Comm'n 1971) (capital structure revised to reflect refunding of bond issue maturing in near future); *Pennsylvania Public Utility Commission v. York Telephone & Telegraph Co.*, 53 P.U.R. 3d 146 (Pa. Pub. Util. Comm'n 1963) (capital structure with higher debt ratio considered appropriate in view of refinancing of short-term debt). *See also Re Potomac Electric Power Co.*, 83 P.U.R. 3d 113 (D.C.Pub.Serv.Comm'n 1970) (recognizing debt and preferred stock issued in year following test year in computing cost of debt and preferred stock.)[15]

In the circumstances, the Commission properly adopted a 60/40 capital structure for the purpose of determining General Waterworks' cost of capital.

## B. *Cost of Debt*

The parties agree that the Water Companies' cost of debt for purposes of the rate proceedings is 8.0%. Therefore the cost of

debt is not in issue in this case. *Compare New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 33–34 (1978); *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1096 (1977).

## C. *Cost of Equity*

In *New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 390 A.2d 8, 37–38 (1978), this Court explained its necessarily limited scope of review of the Commission's cost-of-equity determinations:

"Our analysis of the record on this issue has demonstrated that the determination of the cost of equity is one of the most difficult and complex tasks facing the Commission. The Commission must utilize to the fullest its regulatory expertise and skill to analyze the highly technical economic and financial data presented on this issue. We cannot and will not attempt to second guess the Commission on such matters lying particularly within its area of expertise. Only when its actions are unreasonable or unsupported by substantial evidence may we intervene. *New England Telephone and Telegraph Co. v. Public Utilities Commission*, 148 Me. 374, 377, 94 A.2d 801, 803 (1953). Moreover, the burden of proof rests upon [the utility] to demonstrate that the Commission has committed legal error. 35 M.R.S.A. § 307; *Central Maine Power Co. v. Public Utilities Commission, supra*, 156 Me. at 299, 163 A.2d at 765 (1960)."

Our limited analysis of the Commission's cost-of-equity determination is basically twofold: (1) whether it is reasonable in result and methodology, and (2) whether it is supported by substantial evidence.

Cost of equity is often the subject of disagreement between the utility and the Commission staff, and this case is no exception. The Water Companies presented the

---

**15.** "We are mindful, first, of the task we are undertaking here. We are attempting to establish the cost of capital for Pepco for a period in the future. The first element is the cost of debt and preferred stock and, in accordance with the analysis of all the expert testimony, we base our computation on the embedded cost of those types of securities. It is frankly too unrealistic and theoretical for us to ignore the issuance of securities which have already had an undeniable and continuing effect on the cost of debt and preferred stock." *Id.* at 137.

testimony of Mr. Mulle, who recommended a minimum cost of equity of 14% for General Waterworks. The Commission staff presented the testimony of Mr. Packard, who suggested a cost of equity of 12.2% based upon a recommended range of 12.0% to 12.6%. The Commission found the Water Companies' cost of equity to be 12.0%.

The Water Companies raise a number of objections to the Commission's finding. First, they assert that Mr. Mulle's approach was superior to that used by Mr. Packard for determining the cost of equity. Mr. Mulle employed several methods and approaches plus a number of "adjustments" to arrive at his recommended cost of equity. Mr. Packard relied almost exclusively on the discounted cash flow ("DCF") method for calculating the cost of equity.[16] The Commission rejected Mr. Mulle's approach for a number of reasons articulated in its decree.

It is not necessary for us to review each of Mr. Mulle's approaches and the Commission's reasons for rejecting them. *Compare New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* at 35–36 (1978). The Commission's decree reflects adequate consideration of each of those approaches, explaining the Commission's reasons for rejecting them. Those reasons have support in Mr. Packard's criticisms found in the record.

■ We hold that the Commission's treatment of the Water Companies' cost-of-equity testimony was both reasonable and sufficient. *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* at 36 (1978). Choice of methods to compute such factors as cost of equity, at least in the realm where rational persons could disagree, belongs to the Commission. *Central Maine Power Co. v. Public Utilities Commission,* Me., 382 A.2d 302, 317 (1978).

As a proper exercise of its rate-making powers and responsibilities, the Commission may reject the evidence of one expert and accept the evidence of another. *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 253, 136 A.2d 726, 741 (1957).

■ Our remaining consideration is whether the result and the method actually used by the Commission were reasonable and supported by substantial evidence. The Commission relied heavily on the testimony of Mr. Packard who used the DCF method to determine the cost of equity. He stated that this method defines the cost of equity as the market rate of discount that equates the present value of all expected future dividends per share with the current market price of the stock. According to the basic equation presented by Mr. Packard, the cost of existing equity is equal to the sum of the current percentage dividend yield and the anticipated percentage growth in dividends per share.

Mr. Packard then selected the corporation to whose stock the DCF formula would be applied. Three corporate levels were considered for purposes of cost-of-equity analysis: the Water Companies, General Waterworks, and I. U. International. Both the Commission staff and the Water Companies disregarded, for purposes of cost-of-capital analysis, the corporate level of the Water Companies themselves, whose capital structure consists essentially of 100% common equity, nearly all owned by General Waterworks. Mr. Mulle focused his analysis at the General Waterworks level for purposes of determining the cost of equity.

On the other hand, Mr. Packard focused on I. U. International in order to derive a cost of equity by means of the DCF formula. He explained that this was the corporate level at which investors desiring to

---

**16.** In *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 390 A.2d 8 (1978), we sustained the Commission's reliance on a DCF formula used by Mr. David A. Kosh to calculate the cost of equity in that case. Of course, our approval of the Commission's use of the DCF method in that case does not automatically warrant its approval in this case.

We must evaluate each case on its own merits to see if the method and result are reasonable and supported by substantial evidence. In *Mechanic Falls Water Co. v. Public Utilities Commission,* Me., 381 A.2d 1080 (1977), we sustained a Commission determination of the cost of equity based on a "comparable earnings" test.

invest in the Water Companies would make their common equity purchases, because neither General Waterworks nor the Water Companies have an active market in which their stock is traded. He testified that the cost of equity to General Waterworks was essentially the same as the cost of equity to I. U. International.

The Commission adopted Mr. Packard's approach:

"[T]he commission notes that Mr. Packard's calculations were based on the cost of equity for I. U. International. Because General Waterworks sells no common stock on the open market and because it is wholly owned and controlled ultimately by I. U. International, we will impute the I. U. cost of equity to General Waterworks and apply it to the General Waterworks' capital structure used in F.C. No. 2120 [*Re Mechanic Falls Water Co.*, 13 P.U.R. 4th 347 (Me. Pub. Util. Comm'n 1976)]." *Re Mars Hill & Blaine Water Co.*, 19 P.U.R. 4th 380, 392 (Me. Pub. Util. Comm'n 1977).

Accordingly, Mr. Packard analyzed the history of I. U. International's common stock and dividends in order to derive the figures to be used in his DCF formula. He calculated I. U. International's current dividend yield to be approximately 8.2% (within a range of 7.7% to 8.6%) and its anticipated growth in dividends per share to be approximately 4.0% (within a range of 3.6% to 4.6%) to produce a DCF cost of equity of approximately 12.2%. However, he stated that a current yield of 8.2% was relatively high, especially compared to yields prior to November, 1976. He testified that the 4.0% anticipated growth rate was therefore generous and not reflective of the decline in earnings per share during 1975 and 1976. During subsequent oral testimony, Mr. Packard recommended a range for the cost of equity of 12.0% to 12.6% on the basis of his calculations.

The Commission settled on a 12.0% cost of equity. It reasoned in part:

"We have reduced the return on equity from the 12.2 per cent recommended by the staff to 12.0 per cent which brings the rate of return (computed on a 60/40 capital structure and the undisputed 8.0 per cent cost of debt) to 9.6 per cent. Our decision in this matter is supported by the recent action of the New York commission in the New Rochelle case provided to us by Mr. Putnam. In that proceeding the commission reversed the hearing examiner's decision to grant a 13.0 per cent return on equity and instead allowed 11.5 per cent, computed on the basis of a General Waterworks' growth rate of 3.3 per cent (compared to Mr. Packard's 4.0 per cent for I. U. International) and a dividend yield of 8.2 per cent. The New York commission noted that the capital market's required return from water companies was declining and the dividend yield in January, 1977, for the list of 16 'comparable' water companies had fallen to 7.4 per cent.

"Mr. Mulle himself also recognized that recent declines in the cost of debt had lowered the cost of equity about half a percentage point since June, 1976. Since we had found the cost of equity to General Waterworks to be 12.6 per cent a year ago, our adjustment to 12.0 per cent as of today is consistent with the decline (though not the level) attested to by Mr. Mulle." *Re Mars Hill & Blaine Water Co., supra* at 391–92 (footnotes omitted).

We find no error warranting interference in the Commission's reasoned decision that the cost of equity is 12.0%. Our careful review of the record convinces us that use of the DCF formula is a reasonable method of determining the cost of equity in this case. The selection of ratemaking methods lies primarily within the discretion and expertise of the Commission. We find sufficient evidence in the record to support the Commission's application in this case of the DCF formula.

We also find the use of I. U. International as the focus of the DCF analysis to be reasonable and within the Commission's area of expertise and discretion. Because General Waterworks has no stock which is actively traded on the open market, the Commission could properly apply the DCF

formula to I. U. International's common equity, which is subject to the competitive effects of the marketplace. The Commission could reasonably find that General Waterworks' cost of equity is essentially the same as I. U. International's cost of equity, and thereby impute that cost to General Waterworks.

We note one difference between the Commission's application of the DCF formula in *New England Telephone & Telegraph Co. v. Public Utilities Commission, supra* (1978), and its application in this case. In *New England Telephone*, the DCF formula, used by the witness for the Commission staff, Mr. David A. Kosh ("anticipated dividends and expected future growth"), provided what he termed a "bare cost of equity." 390 A.2d at 36. New England Telephone and the Commission agreed that the "bare cost of equity" was not an adequate measure of New England Telephone's cost of equity for rate-making purposes. Because the cost of financing and market pressure associated with a new stock issue may result in "dilution" of the investment of existing stockholders, the Commission made an explicit adjustment to the "bare cost of equity" to maintain an appropriate "market-to-book" ratio for New England Telephone's common stock. 390 A.2d at 36–37.

In the present case the DCF formula used by Mr. Packard ("current yield" plus "anticipated growth in dividends per share") provided what he termed a "cost of existing equity." From a comparison of the record in this case with *New England Telephone*, it appears that Mr. Packard's cost of existing equity is the equivalent of Mr. Kosh's bare cost of equity. However, in this case, the Commission made no explicit adjustment to offset dilution as it did in *New England Telephone*.

We need not consider whether the Commission was required to provide explicitly a "dilution adjustment" in this case, where the DCF approach was used to determine cost of equity, because the absence of such an explicit adjustment is not assigned as error by the Water Companies on appeal.

*Compare Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 496 (1978). Moreover, the record of the proceedings before the Commission indicates that the subject of an adjustment for dilution-producing factors was considered by the witnesses and the Commission and could have been reflected in the Commission's final determination of a 12.0% cost of equity, which we find is supported by substantial evidence.

The Water Companies launch a number of other attacks on the Commission's finding of a 12.0% cost of equity as allegedly having no support in the record. They argue that because Mr. Packard recommended a 12.2% cost of equity, the Commission's 12.0% cost-of-equity figure lies outside the record. In fact, Mr. Packard recommended a range of 12.0% to 12.6% for the cost of equity. Therefore, the Commission's figure is directly supported by Mr. Packard's testimony.

The Commission is not bound to use only those figures recommended by witnesses. On the basis of evidence in the record and with the use of its own expertise, it may make its own informed judgment as to the proper cost of equity, whether or not that cost is specifically recommended by any witness. *Maine Water Co. v. Public Utilities Commission, supra* at 496.

The Water Companies also argue that the Commission failed to explain adequately its reasons for adopting a 12.0% cost of equity instead of the 12.2% recommended by Mr. Packard. However, the Commission's decree states that Mr. Packard admitted that his yield figure was "relatively high" and that his growth rate was "generous." The Water Companies reply that the Commission has not adequately explained which and to what extent each of these individual factors caused it to conclude that the recommended cost of equity should be 12.0% instead of 12.2%. The Commission is not required to go into such detail in its decree. "Ratemaking is not an exact science and often calls for estimations and predictions." *Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483, 494

(1978). The Commission need not, and often cannot, specify its reasons in such detail as the Water Companies request. It is sufficient if the Commission exercises reasonable judgment based on substantial evidence. *See Maine Water Co. v. Public Utilities Commission*, Me., 388 A.2d 493, 498 (1978).

 One minor issue remains. In its decree the Commission said:

"Mr. Mulle himself also recognized that recent declines in the cost of debt had lowered the cost of equity about half a percentage point since June, 1976. Since we had found the cost of equity to General Waterworks to be 12.6 per cent a year ago [*Re Mechanic Falls Water Co.*, 13 P.U.R. 4th 347 (Me. Pub. Util. Comm'n Jan. 26, 1976)], our adjustment to 12.0 per cent as of today is consistent with the decline (though not the level) attested to by Mr. Mulle." *Re Mars Hill & Blaine Water Co., supra* at 392.

The Water Companies contend that the record does not support the quoted statement. Although we agree that the Commission's reasoning in the quoted statement is faulty,[17] the error does not justify our setting aside the Commission's finding of a 12.0% cost of equity. We have already found that the Commission's determination is supported by substantial evidence elsewhere in the record. Moreover, it is unnecessary for the Commission to reconcile its cost-of-equity finding in this case with a finding it made a year earlier with respect to General Waterworks. The cost of equity determined for a utility during one proceeding has some evidentiary value, but is not controlling, with respect to the cost to be found in the subsequent proceeding. *Central Maine Power Co. v. Public Utilities Commission*, 153 Me. 228, 252–53, 136 A.2d 726, 740–41 (1957).

In conclusion, we hold the Commission's finding of a rate of return of 9.6% for the Water Companies, based on a 9.6% cost of capital to General Waterworks, using a 60/40 capital structure, 12.0% cost of equity,

and 8.0% cost of debt, to be reasonable and supported by substantial evidence.

The entry in each case must be:

Section 303 appeal denied; decrees and orders of the Public Utilities Commission affirmed.

Judgment for defendant Public Utilities Commission on the section 305 complaint.

McKUSICK, C. J., did not sit.

ARCHIBALD and DELAHANTY, JJ., did not sit.

DUFRESNE, A. R. J., sat by assignment.

---

17. We find nothing in the record indicating that the cost of equity could not have risen after the Commission's decision in *Mechanic Falls* and before it experienced the decline testified to by Mr. Mulle.